U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2016 JUN 27 AM II: 13

BY _____
DEPUTY CLERK

RICHARD A. TURNER,                    )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )        Case No. 5:15-cv-75
                                       )
COMMISSIONER OF SOCIAL                 )
SECURITY,                              )
                                       )
        Defendant.                     )

**OPINION AND ORDER**
(Docs. 14, 20)

Plaintiff Richard A. Turner brings this action under 42 U.S.C. § 405(g), requesting

review and remand of the decision of the Commissioner of Social Security denying his

application for a period of disability and disability insurance benefits (DIB) and for supplemental

security income (SSI). (Doc. 4.) Turner has filed a motion seeking remand for calculation of

benefits or, alternatively, reversal and remand for further proceedings. (Doc. 14.) The

Commissioner has filed a motion to affirm. (Doc. 20.) For the reasons stated below, Turner's

motion is GRANTED IN PART, and the Commissioner's motion is DENIED.

**Background**

Turner was 47 years old on his alleged disability onset date of August 13, 2010. On that

date he was riding his motorcycle and was involved in a collision with a car; his injuries included

an injury to the head. (*See* AR 36–37.) He did not complete his secondary education, and

testified that he cannot read, write, or do math. (AR 36.)[1] He lives with his wife Darlene Turner,

_____

[1] Turner testified at the January 21, 2014 administrative hearing that he has a seventh-
grade education. (AR 36.) However, at a March 12, 2013 appointment he reported to
neuropsychologist Dr. Robert Roth that he had completed the tenth grade. (AR 495.) In his

who filled out the benefits forms and correspondence related to Turner's application. (*See* AR 114, 215, 225.)[2] Prior to the alleged disability period, Turner was self-employed in the business of repairing car transmissions. (AR 39–40.)

At the January 21, 2014 administrative hearing, Turner testified that the August 13, 2010 accident "really took a toll" on his body. (AR 38.) He testified to pain in his shoulder blade, stiffness turning his head, "tremendous" pain in his neck, and "[w]icked headaches" every day since the August 13, 2010 collision. (AR 43.) He further testified that his arms and fingertips are numb, that he feels dizzy every day (AR 44), and that he has had trouble with his memory since the accident (AR 46). He described his mood since the collision as bad, including anger, frustration with his limitations, and frustration with his treatment providers. (AR 45.)

Turner testified that on an average day he sleeps about fifteen hours. (AR 43.) He stated that he does not have any hobbies, does not socialize with anyone, and that household tasks like doing dishes are difficult because he cannot remain standing for more than five or ten minutes. (AR 46–47.) He said he cannot remain sitting because it causes numbness from the waist down, and that he is unable to lift things—like a jug of milk—because of the numbness in his hands. (AR 47.) He reported smoking less than one pack of cigarettes per day. (AR 539.) He is able to drive only a "[v]ery, very, little bit" because his balance is compromised and if he drives it feels

---

January 16, 2012 Adult Function Report, he asserted that he had only a sixth grade education. (AR 225.)

[2] It appears that Turner is able to sign his name. (*See, e.g.*, AR 111, 114, 122, 123, 194, 226.)

"like everything's, like, going over to the left." (AR 48.)[3] Turner also suffers from chronic
obstructive pulmonary disease (COPD), diabetes, and hypertension. (*See* AR 539.)

On June 7, 2011, Turner protectively filed applications for a period of disability
insurance and disability insurance benefits, and for supplemental security income. (AR 169,
173.) Those applications were denied initially (AR 59–76), and on reconsideration (AR 77–
106), and Turner filed a timely request for an administrative hearing on October 1, 2012 (AR
124–25). On October 25, 2012, before the administrative hearing was held, Turner was involved
in a second motor vehicle accident, resulting in injuries to his left shoulder and arm, and
aggravating his neck pain. (AR 49.) Administrative Law Judge (ALJ) Thomas Merrill
conducted the administrative hearing on January 21, 2014. (AR 31–58.) Turner appeared and
testified, and was represented by his attorney, Mitchell Pearl. Vocational Expert (VE) James
Parker also testified at the hearing.

On February 27, 2014, the ALJ issued a decision finding that Turner was not disabled
under the Social Security Act from his alleged onset date of August 13, 2010 through the date of
the decision. (AR 13–25.) On or about April 23, 2014, Turner requested review with the
Appeals Council. (AR 8–9; 250–54.) On or about January 26, 2015, while the appeal was
pending, Turner filed a request that the Appeals Council consider new evidence regarding his
recent diagnosis of tongue cancer and scheduled surgery for partial removal of his tongue. (AR
255–56.) In a decision dated March 10, 2015, the Appeals Council declined to consider the
additional evidence, reasoning that it did not meet the criteria for consideration under 20 C.F.R.
§ 405.401(c). (AR 2.) The Appeals Council denied Turner's request for review, rendering the

---

[3] However, on March 12, 2013 he reported to Dr. Roth that he had "no difficulty driving
other than tending to drift a bit." (AR 495.)

ALJ's decision the final decision of the Commissioner. (AR 1–4.) Turner filed his Complaint in

this action on April 2, 2015. (Doc. 4.)

<u>**The ALJ's February 27, 2014 Decision**</u>

The Commissioner uses a five-step sequential process to evaluate disability claims.

*Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. If he is not, the Commissioner next considers whether
> the claimant has a "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix 1 of the regulations. If
> the claimant has such an impairment, the Commissioner will consider him [*per
> se*] disabled. . . . Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work. Finally, if the claimant is
> unable to perform his past work, the Commissioner then determines whether there
> is other work which the claimant could perform.

*Id.* (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alterations in original)); *see*

20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proving his case at steps one

through four. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). At step five, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national economy

that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Employing that sequential analysis, the ALJ first determined that Turner had not engaged

in substantial gainful activity since his alleged disability onset date of August 13, 2010. (AR

15.) At step two, the ALJ found that Turner had the following severe impairments: degenerative

disc disease, spine disorder, COPD, and intracranial injury/concussion (mild). (AR 15.) At step

three, the ALJ considered Listing 1.04 (disorders of the spine), Listing 3.02 (chronic pulmonary

insufficiency), and Listing 11.04 (central nervous system vascular accident), and concluded that

none of Turner's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 16–17.)

Next, the ALJ determined that Turner had the residual functional capacity (RFC) to perform "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except as follows:

> [Turner] can lift and carry up to 10 pounds on a frequent basis. He can sit and stand and walk for 6 hours in an 8-hour workday. He can occasionally push and pull with the bilateral upper extremities. He can occasionally climb ladders, frequently stoop and crouch, and perform the remaining postural activities on an unlimited basis. He can occasionally reach overhead bilaterally. He should avoid concentrated exposure to respiratory irritants.

(AR 17.) The ALJ found that Turner had no past relevant work. (AR 24.) The ALJ further found that Turner has a "limited education" as defined under 20 C.F.R. §§ 404.1564(b)(3) and 416.964(b)(3), but that he is able to communicate in English. (AR 24.) Based on those findings, the testimony of the VE, and Turner's RFC, the ALJ determined that Turner could perform jobs existing in significant numbers in the national economy, including the following representative occupations: small product assembler, price marker, and gate guard. (AR 24–25.) The ALJ concluded that Turner was not under a disability, as defined in the Social Security Act, from the alleged onset date of August 13, 2010 through the date of the decision. (AR 25.)

## Standard of Review

The Social Security Act defines the term "disability" in pertinent part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only upon a determination that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court conducts "'a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also* 42 U.S.C. § 405(g). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*, 566 F.3d at 305 (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Turner claims that the ALJ erred in three ways. First, Turner asserts that the ALJ failed to give adequate weight to the opinion of his treating physician, Dr. Megan Greenleaf. Second, he argues that the ALJ improperly devalued his credibility. Third, he contends that the ALJ's findings at step five are contrary to the evidence of his illiteracy. Turner also claims that the Appeals Council erred in excluding his additional documents regarding the diagnosis and treatment of his cancer. The Commissioner opposes each of those claims.

## I.      Analysis of the Medical Opinions

Turner contends that the ALJ arrived at an inaccurate determination of his RFC by failing

to give controlling weight to the opinion of his treating physician, Dr. Greenleaf.  Turner also

argues that the ALJ failed to properly assess the regulatory factors in determining how much

weight to give to Dr. Greenleaf's opinions.

Dr. Greenleaf began treating Turner on October 8, 2013.  (AR 538.)  At a "get acquainted

visit" with her, Turner reported decreased energy, poor sleep, hypertension, diabetes, and pain,

with associated headache, upper extremity weakness, and impaired memory and vision.  (*Id.*)  He

further reported that he was extremely frustrated by a lack of any unifying diagnosis from

physicians he had seen previously.  (*Id.*)

It appears that, by the time Dr. Greenleaf completed her treatment notes from Turner's

October 8, 2013 visit, she had received at least some of Turner's medical records, dating from

November 2009 through August 2013.  (*See* AR 537.)  She remarked that Turner had undergone

"thorough evaluations at [Dartmouth Hitchcock Medical Center] by Neurology," and that he had

seen a physical therapist and spine specialists.  (AR 538.)  She noted that an August 4, 2012 MRI

of Turner's cervical spine had revealed "right-sided disc bulge with facet hypertrophy (no

pathology on left)."  (AR 538–39.)  Dr. Greenleaf also reviewed a copy of a report of a CT scan

of Turner's brain, which came back normal.  (AR 538.)

Dr. Greenleaf noted: fatigue, decreased taste or smell due to severe leukoplakia,[4]

difficulty swallowing, back pain, arm weakness, joint pain and stiffness, decreased range of

motion, feeling of instability, and limitations of daily activities.  (AR 539.)  She also noted

---

[4] Leukoplakia is "[a] white patch of oral . . . mucous membrane that cannot be wiped off
and cannot be diagnosed clinically as any specific disease entity."  *Stedman's Medical
Dictionary* 491590 (28th ed. 2006) (Westlaw).  It is also known as "smoker's patches."  *Id.*

headaches, numbness, tingling, weakness, dizziness, coordination or balance problems,

disequilibrium, easily distracted, and decreased memory. (*Id.*) Also at the October 8, 2013 visit,

Dr. Greenleaf performed a physical examination. (AR 540.) She found, among other things,

positive Romberg sign. (*Id.*)[5]

Assessing Turner's chronic pain due to trauma, Dr. Greenleaf remarked that the limited

prior imaging she had at that time showed "no anatomic explanation for the intermittent left arm

numbness, tingling, and weakness that would be amenable to surgical intervention." (AR 541.)

However, based on her examination, Dr. Greenleaf found that Turner had "significant

malalignment of his scapulae and thoracic spine," and she suspected that he had "intermittent

nerve impingement due to muscle spasm." (*Id.*) She concluded that Turner's thoracic pain, as

well as the "snapping" and pain in his right neck, were "from chronic malalignment and resultant

ligament and muscle shortening." (*Id.*) Dr. Greenleaf advised Turner that regaining his strength

and flexibility could only be achieved through intensive rehabilitation therapy to retrain his

muscles. (*Id.*) Turner stated, however, that he was not interested in physical therapy or

occupational therapy programs. (*Id.*)

At a November 15, 2013 follow-up visit and physical examination with Dr. Greenleaf,

Turner offered additional details regarding some of his symptoms. (AR 543–44.) Regarding

cognitive function, she noted that Turner recalled his past history and had no impairment of

concentration. (*Id.*) She found his thought processes and cognitive function to be "concrete."

(*Id.*) As to Turner's musculoskeletal system, she noted "[p]alpable muscle spasm along right

upper scapula" and "[m]uscular atrophy medial to right scapula." (*Id.*) Regarding Turner's

---

[5] Romberg sign is "when a patient, standing with feet approximated, becomes unsteady or
much more unsteady with eyes closed. Open, it is a sign of proprioception loss." *Stedman's
Medical Dictionary* 820310 (28th ed. 2006) (Westlaw).

chronic pain, Dr. Greenleaf recommended an evaluation for a potential "trigger point injection," which she concluded "could lead to muscle relaxation and allow for strengthening through physical therapy." (*Id.*)

On January 13, 2014, Dr. Greenleaf completed a Medical Source Statement (MSS) of Ability to do Work-Related Activities. (AR 546–51.) She stated that Turner could only occasionally lift or carry up to 10 pounds, and could never lift or carry more than that. (AR 546.) She noted that testing of Turner's strength was limited "due to pain and apprehension with minimal resistance," but that Turner had "known neural foraminal stenosis of cervical spine." (*Id.*) Dr. Greenleaf indicated that Turner could sit, stand, or walk for no more than 30 minutes at a time, and that in an eight-hour workday he could sit for a total of four hours, stand for a total of two hours, and walk for a total of two hours. (AR 547.) In support of those conclusions, Dr. Greenleaf noted that Turner had asymmetric truncal alignment and that he was unable to maintain one position due to muscular spasm and atrophy. (*Id.*)

Regarding use of hands, Dr. Greenleaf noted that Turner is right-handed, and that he can only occasionally reach, handle, finger, feel, push, or pull with his right hand. (AR 548.) She indicated that he could never perform those activities with his left hand. (*Id.*) Dr. Greenleaf's findings supporting those conclusions were that Turner's left-hand grip is weaker than his right and that he has "subjective left-sided pain, numbness, tingling." (*Id.*) She also noted, however, that Turner's imaging showed "more right-sided pathology, as does his examination." (*Id.*) Dr. Greenleaf further reported that Turner could continuously use both feet to operate foot controls. (*Id.*) With respect to postural activities, Dr. Greenleaf noted that Turner had traumatic

labyrinthine disorder, and that he could therefore never climb stairs, ramps, ladders, or scaffolds, and could never balance, stoop, kneel, crouch, or crawl.  (AR 549.)[6]

Regarding environmental limitations, Dr. Greenleaf stated that Turner could never tolerate unprotected heights due to labyrinthine disorder.  (AR 550.)  She also stated that Turner's memory loss and cognitive impairment meant he could never be exposed to moving mechanical parts or operating a motor vehicle.  (*Id.*)  However, Dr. Greenleaf reported that Turner could occasionally be exposed to humidity and wetness, dust, odors, fumes, and irritants, cold, heat, and vibrations.  (*Id.*)  Dr. Greenleaf did not assess Turner as being unable to participate in any representational physical activities, such as shopping, walking, preparing meals, and handling paper files.  (AR 551.)  Finally, Dr. Greenleaf remarked that Turner "[d]emonstrates significant fixation on his accidents.  I did not know him prior to [motor vehicle accidents], but this could certainly be a result of traumatic brain injury."  (*Id.*)

ALJ Merrill gave Dr. Greenleaf's January 2014 MSS only "limited weight."  (AR 23.) The ALJ remarked that Dr. Greenleaf had only a "minimal treating relationship" with Turner. (*Id.*)  The ALJ also found Dr. Greenleaf's opinion regarding Turner's functioning prior to the beginning of treatment to be "speculative, as it is not clear that she reviewed his treatment notes instead of relying upon his own reports."  (*Id.*)  And, according to the ALJ, Dr. Greenleaf's opinion was not entirely supported by her own treatment notes, since her opinion about Turner's ability to sit, stand, or walk was based on Turner's "muscular spasm and atrophy," but the only clinical record to mention atrophy was Dr. Greenleaf's November 15, 2013 examination.  (*Id.*) The ALJ also noted Turner's lack of exercise despite recommendations, and consistent refusal to

---

[6] The labyrinth is part of the ear, which plays a role in equilibrium.  *Stedman's Medical Dictionary* 275830 (28th ed. 2006) (Westlaw) ("ear").  Labyrinthine disorders can cause vertigo. *Stedman's Medical Dictionary* 983690 (28th ed. 2006) (Westlaw) ("aural vertigo").

participate in physical or occupational therapy.  (*Id.*)  Finally, the ALJ remarked that clinical examinations documenting decreased grip strength showed only mild deficits and nothing that would render Turner unable to use his left upper extremity for any task.  (AR 23–24.)

Under the treating-physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Even when a treating physician's opinion is not given controlling weight, it is still entitled to some weight because treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, the weight to be given the opinion depends on several factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is of a specialist; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).  The Commissioner is required to give "good reasons" for the weight given to a treating source's opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, the record indicates that Dr. Greenleaf examined Turner on only two occasions in the fall of 2013 before completing her January 2014 MSS.  That limited treating relationship over a short period of time is a sufficient basis to give Dr. Greenleaf's opinion less than

controlling weight.  *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer

a treating source has treated you and the more times you have been seen by a treating source, the

more weight we will give to the source's medical opinion.  When the treating source has seen

you a number of times and long enough to have obtained a longitudinal picture of your

impairment, we will give the source's opinion more weight than we would give it if it were from

a nontreating source."); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per

curiam) (opinion of physician who had examined claimant only "once or twice" was not entitled

to the extra weight of that of a "treating physician"); *Rye v. Colvin*, No. 2:14-cv-170, 2016 WL

632242, at *7 (D. Vt. Feb. 17, 2016) (physician who examined claimant on only two occasions

over a one-month period was not a "treating source"; ALJ did not err in giving less than

controlling weight to physician's opinions).

     Turner does not dispute that Dr. Greenleaf started treating him later in the overall course

of his post-accident treatment, but he contends that that timing "actually aided her in developing

the kind of 'longitudinal picture' of Plaintiff's impairment that is contemplated by 20 C.F.R.

§ 404.1527(c)(2)(i)."  (Doc. 14 at 20.)  Turner supplies no support for that proposition.  Dr.

Greenleaf may have had the benefit of reviewing some of Turner's medical history when she

started treating him in October 2013, but the "longitudinal picture" that the regulations identify

comes from the *treating* relationship, not from review of medical records.  The court therefore

concludes that the ALJ properly gave Dr. Greenleaf's opinion less than controlling weight.

     The court further concludes that the ALJ supplied good reasons for giving Dr.

Greenleaf's opinion only "limited weight."[7]  One of the reasons the ALJ gave for that assignment

---

[7] Turner asserts that the ALJ actually "completely ignore[d]" Dr. Greenleaf's opinions,
arguing that the ALJ's RFC finding does not reflect Dr. Greenleaf's opinions at all, and that the
ALJ did not refer to Dr. Greenleaf's MSS in the course of his credibility findings. (Doc. 14 at 19

of weight is relatively weak. The ALJ found that Dr. Greenleaf's opinion regarding Turner's functioning prior to the beginning of treatment in October 2013 was "speculative" because it was unclear that Dr. Greenleaf reviewed Turner's treatment notes instead of relying on his own reports. (AR 23.)[8] It is true that Dr. Greenleaf's treatment notes do not explicitly mention all of the historical medical documentation that her office had received, but that does not prove that she failed to review the documentation.

However, the ALJ also identified stronger reasons for giving Dr. Greenleaf's opinions only limited weight. One is that Dr. Greenleaf had a minimal treating relationship with Turner. Although Dr. Greenleaf did have the benefit of examining Turner on two occasions, that was not sufficient to give Dr. Greenleaf the kind of detailed, longitudinal picture that would come from a lengthier treatment relationship. Dr. Greenleaf was otherwise in a position similar to the state agency consultants with respect to reviewing Turner's medical records.

The ALJ also found that Dr. Greenleaf's opinion regarding Turner's inability to engage in prolonged positioning was not entirely supported by her own treatment notes, since Dr. Greenleaf based her opinion on Turner's muscular spasm and atrophy, yet the only clinical examination documenting muscular atrophy in the record is the examination performed by Dr. Greenleaf on November 15, 2013. The ALJ concluded that muscular atrophy was therefore "not present on a consistent basis." (AR 23.)

In addition, the ALJ noted that "clinical examinations documenting decreased grip strength show only mild deficits." (AR 23.) Dr. Richard Morrison performed a consultative

---

n.5; *see also* Doc. 23 at 5.) The court notes that the ALJ explicitly stated that he considered the opinion evidence in the record. (AR 17.) The court discusses credibility in detail below.

[8] Regarding Turner's own reports, the ALJ found Turner's allegations of his limitations to be less than fully credible. (AR 18.) The court discusses credibility below.

examination on September 8, 2011, and found that Turner's "[g]rasp is weak bilaterally." (AR 370.) But Dr. Thomas Jager examined Turner at the Emergency Department after Turner's October 2012 collision, and found that his "[h]and grasp is strong on the left equal than on the right." (AR 443.) On the issue of grip strength, there was therefore substantial evidence to support the conclusion that Turner's grasp is equally strong on the left and the right. Aside from that issue, Dr. Greenleaf's opinion that Turner could never use his left hand for reaching, handling, fingering, feeling, pushing, or pulling was based on Turner's "subjective" left-sided pain, numbness, and tingling. (AR 548.) As discussed below, the ALJ found Turner's subjective reports to be less than fully credible.

The ALJ gave "substantial" weight to the August 20, 2012 opinion of state agency consultant Dr. Leslie Abramson. (AR 22.) The opinions of agency consultants may override those of treating physicians when the agency consultants' opinions are more consistent with the record evidence. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (regulations "permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record"); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").[9] The ALJ found that Dr. Greenleaf's opinion was not entirely supported by the record evidence (AR 24), but that Dr. Abramson's opinion was "consistent with the evidence of record in its entirety" (AR 23).

---

[9] As noted above, Dr. Greenleaf was not a "treating source" because of the limited treating relationship.

Two issues of physical ability are critical to the disability determination: Turner's postural abilities, and his ability to bilaterally reach, handle, finger, and feel.[10] The VE testified that if Turner could occasionally reach, handle, finger, and feel with his right hand but never with his left, and that if he could never perform the postural activities, then he would be unable to sustain any work. (AR 54.) The court concludes that substantial evidence supports the ALJ's determination regarding the consistency of the medical opinions with the record evidence on those issues.

Dr. Greenleaf opined that all postural activities and ability to tolerate heights were foreclosed by Turner's dizziness and traumatic labyrinthine disorder. (AR 549–50.) Turner points out that his previous primary care physician, Dr. Peter Hogenkamp, noted complaints of dizziness on multiple occasions after August 13, 2010 (AR 286, 288), and neurologist Dr. Parker Towle diagnosed traumatic labyrinthine disorder in November 2010 (AR 319). Turner also notes that Dr. Greenleaf found positive Romberg sign at the October 8, 2013 physical examination. Dr. Abramson found, however, that there was no objective evidence to support dizziness, since the records showed that Romberg tests were consistently normal and Turner's gait is consistently steady. (AR 98.) The court's review of the record is in accord (with the sole exception of the positive Romberg sign in October 2013—which was found after Dr. Abramson's August 2012 opinion). Dr. Abramson also noted that Turner mentioned dizziness only once on his function report, and only in relation to reaching. (AR 99, 223.) There was thus more than a "scintilla" of evidence contravening Turner's reports of severe dizziness that might preclude all postural activities.

---

[10] The Commissioner correctly notes that, even accepting Dr. Greenleaf's more restrictive assessment regarding Turner's ability to sit, stand, walk, and lift, Turner would still be able to perform the jobs identified by the VE. (*See* AR 53–54.)

As stated above, Dr. Greenleaf opined that, based on Turner's weak left-hand grip and his "subjective" left-sided pain, numbness, and tingling, he could never use his left hand for reaching, handling, fingering, feeling, pushing, or pulling. (AR 548.) Dr. Abramson's opinion is that Turner is limited to only occasional overhead reaching due to exacerbation of neck pain, but that he is unlimited with respect to handling, fingering, and feeling. (AR 86.) As described above, there was substantial evidence to support the conclusion that Turner's grasp is equally strong on the left and the right. Regarding Turner's "subjective" left-sided pain, numbness, and tingling, the court notes that Dr. Abramson's assessment of Turner's credibility is that his allegations of limitations are "not fully supported by the objective medical evidence." (AR 85.) The court therefore turns to the issue of credibility.

## II.   Assessment of Turner's Credibility

The ALJ candidly observed that, Turner's allegations "if fully credible, would warrant additional work-related restrictions." (AR 18.) However, the ALJ found Turner's allegations to be "not entirely supported by or consistent with the evidence of record." (*Id.*) According to the ALJ, "[t]reatment notes and clinical examinations do not provide full support for the claimant's alleged limitations." (*Id.*) Turner asserts that the ALJ improperly devalued his credibility. (Doc. 14 at 21.) The Commissioner contends that substantial evidence supports the ALJ's credibility analysis. (Doc. 20 at 18.)

### A.   Legal Standard

As the ALJ acknowledged in his decision (AR 17–18), the regulations set forth a specific process that an ALJ must follow in assessing a claimant's credibility. The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b). If the ALJ finds such

16

an impairment, the ALJ evaluates the intensity and persistence of the symptoms to determine how they limit the claimant's functioning. *Id.* §§ 404.1529(c), 416.929(c).

If clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations of the impairment, then the ALJ must consider additional factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken by the claimant to relieve the symptoms; (5) other treatment received; (6) any other measures taken to relieve the symptoms; and (7) other factors. *Id.* §§ 404.1529(c)(3)(i)–(vii), 416.929(c)(3)(i)–(vii). "When evaluating the credibility of an individual's statements, the [ALJ] must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)).

### B.    Objective Medical Evidence

The ALJ found that the objective evidence "falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis." (AR 18.) Turner asserts that the ALJ ignored relevant evidence. (Doc. 14 at 23.) For the reasons below, the court concludes that substantial evidence supports the ALJ's conclusion that the objective evidence alone was insufficient to fully support the claimant's testimony concerning the intensity, persistence, or functional limitations of the impairment.

17

An August 4, 2012 cervical spine MRI showed minimal disc bulges at multiple levels and diffuse neural foraminal stenosis, generally worse on the right. (AR 439.) It does not appear, however, that any medical professional concluded that those findings could fully explain Turner's alleged symptoms. Linda Brown, APRN, advised Turner that not all of his symptoms came from his cervical spine. (AR 468.) Dr. David Coffey reviewed the MRI films and remarked that they "look normal to me." (AR 489.) Even Dr. Greenleaf noted that, although Turner reported left-sided pain, numbness, and tingling, his medical imaging (and physical examination) showed more *right*-sided pathology. (AR 548.)

The ALJ also referred to Turner's treatment notes, and found that "clinical examinations have not consistently documented deficits" and that "those deficits identified at examinations are not commensurate with the degree of limited functioning [Turner] described at the hearing." (AR 21.) The ALJ also recognized that, although Turner did have "some abnormalities upon clinical examination, he does not present with any muscle atrophy, which suggests that he does remain active to some degree." (*Id.*) As noted above, the only clinical finding of muscle atrophy was Dr. Greenleaf's finding on November 15, 2013. Prior to that, physical examinations indicated no such atrophy.

Turner faults the ALJ for finding his finding that Dr. Greenleaf "noted there was no anatomic explanation for intermittent left arm numbness, tingling, and weakness." (AR 21.) Turner correctly points out that Dr. Greenleaf qualified that statement—her actual opinion was that the imaging to which she had access showed "no anatomic explanation for the intermittent left arm numbness, tingling, and weakness *that would be amenable to surgical intervention*." (AR 541 (emphasis added).) However, to the extent that Dr. Greenleaf was suggesting that the

18

imaging showed some non-operable anatomic explanation, that conclusion reinforces the importance of physical or occupational therapy.  The court discusses that issue below.

### C.    Discontinuation of Neuropsychological Testing

Dr. Robert Roth conducted a neuropsychological evaluation on March 12, 2013.  (AR 494–98.)  Dr. Roth administered a battery of tests and reported results (AR 496–97), but concluded that the results "are not likely to be an accurate reflection of [Turner's] current maximal level of cognitive functioning."  (AR 496.)  Dr. Roth explained that conclusion as follows:

> Mr. Turner was cooperative with the interview process but appeared tired, distracted, and not fully invested in the testing process.  He frequently asked the examiner what they were writing during tasks, how long tasks would take, and when the evaluation would be over.  He required frequent encouragement to attempt tasks, especially those he appeared to perceive as challenging.  He also required repetition of instructions on several occasions, appeared to rush through completion of some tasks, and his attention to the tasks at hand appeared variable. Furthermore, he performed below suggested cutoffs on performance validity measures.  Based on these observations and scores testing was discontinued.

(AR 495–96.)  According to Dr. Roth, Turner reported experiencing "emotional distress on questionnaire measures."  (AR 497.)  Dr. Roth also suggested that "frequent poor sleep may be contributing to his cognitive difficulties and to his limited engagement and effort during testing." (*Id.*)

The ALJ found that the discontinuance of the neuropsychological testing "cuts against [Turner's] credibility."  (AR 22.)  Turner asserts that the ALJ seriously misinterpreted Dr. Roth's conclusions; according to Turner, Dr. Roth did not conclude that Turner himself was unreliable, but only that the testing was an unreliable measure of Turner's cognitive functioning.  (Doc. 14 at 22.)  According to Turner, Dr. Roth's remarks about Turner's emotional distress and frequent poor sleep indicate that Dr. Roth believed Turner's symptoms (depression, irritability,

19

distractibility, and fatigue) to be genuine. (*Id.* at 22–23.)  The Commissioner contends that the ALJ properly relied on Dr. Roth's report in the credibility analysis, noting that Dr. Roth stated only that frequent poor sleep "may" be contributing to Turner's limited engagement, and that, while Dr. Roth did not state that Turner was disingenuous, he also did not conclude that Turner's lack of participation was solely due to his symptoms. (Doc. 20 at 19.)

The court finds no error in the ALJ's use of Dr. Roth's report in the credibility analysis. Dr. Roth made no explicit findings regarding Turner's credibility.  However, Dr. Roth did find that Turner performed below suggested cutoffs on "performance validity measures."  Dr. Roth suggested that Turner's poor sleep "may" have "contributed" to his limited engagement and effort during testing, but the ALJ could also reasonably conclude that poor sleep was not the only contributing factor.  Since performance validity measures may relate to malingering or embellishment, performance below those measures could be evidence of that.

### D.    Fatigue; Hours of Sleep

Turner reported to Dr. Greenleaf at his October 8, 2013 visit that he slept poorly and only for five hours per night. (AR 538.)  At his November 15, 2013 appointment with Dr. Greenleaf, he reported sleeping "very heavily," like he was in a "coma," and that his wife was concerned about how many hours he slept—up to 15 hours per day. (AR 543.)  At the January 21, 2014 hearing, Turner testified that on a typical day he "pretty much" slept all day. (AR 38.)  According to Turner, he would sleep "around 15 hours, then I get up, go to the bathroom, then I go lay back to sleep again." (*Id.*)  When asked whether there were some days when he could not sleep, Turner testified, "No, I would say I sleep a lot." (AR 42.)  Turner also testified that he was not able to remain standing or sitting for very long and needed to shift positions often. (*See* AR 47.)

20

The ALJ found Turner's statements about his sleep to be significant to the credibility analysis. (AR 22.) The ALJ noted that—despite Turner's apparent inability to tolerate an MRI while lying down[11]—he did not describe needing to sleep with his head and neck elevated. (AR 20.) The ALJ suggested it was difficult to reconcile Turner's professed inability to maintain one position with his testimony that he slept for 15 hours "straight." (*See* AR 22.) The ALJ also suggested that there was a disconnect between Turner's report to Dr. Greenleaf that he slept only five hours, and his testimony that he slept for 15 hours. (*See id.*)

According to Turner, there is no contradiction between his report to Dr. Greenleaf and his testimony, since he consistently complained that sometimes he slept only a few hours, and sometimes slept for 15 hours. (Doc. 14 at 24.) Turner did in fact report to Dr. Roth that some nights he slept poorly, but that at other times he experienced "hypersomnia and could stay in bed for days." (AR 495.) It does not appear that Turner consistently reported that pattern.

Turner further asserts that, if the ALJ had concerns about how Turner sleeps 15 hours per day, he could have asked Turner at the hearing about what position he sleeps in. (Doc. 14 at 24.) The Commissioner maintains that inconsistencies in the record can be a basis to find a claimant less than credible. (Doc. 20 at 20.) The court concludes that any inconsistency on the issues relating to Turner's sleep could bear only weakly on credibility. His report of sleeping five hours per night could be consistent with a report of sleeping 15 hours per day—there might just be an ambiguity about what time of day Turner is asleep. Turner's reported inability to maintain one position while standing or sitting does not necessarily bear on his ability to sleep "very heavily" for 15 hours because he might not experience the alleged discomfort while asleep. And Turner's inability to tolerate an MRI while lying down also does not rule out sleeping for

---

[11] The August 4, 2012 MRI was an "upright" MRI. (AR 439.)

15 hours, since it is possible that Turner might sleep in a position that he can tolerate.

Ultimately, there are more questions than answers on the issue of Turner's sleep, so to the extent

that they are "inconsistencies," they lend only slight support to the ALJ's credibility finding.

### E.    Compliance With Treatment Recommendations

The ALJ repeatedly remarked that Turner had not attended physical therapy, despite

multiple recommendations from treating providers. (AR 19, 23.)  The ALJ also noted that

Turner had not followed through with other treatment recommendations. (AR 19.)  As

examples, the ALJ observed that Linda Brown recommended facet injections (*see* AR 467), and

that Dr. Coffey had noted some efforts to help Turner—such as with occipital nerve blocks—

were "impossible" because Turner refused to accept them (AR 473).  In addition, the ALJ

referenced Dr. Hogenkamp's observations that Turner is a "noncompliant" patient, a "poor

historian," and that Turner repeatedly cancelled or failed to show up for his scheduled MRI, and

missed follow-up appointments.  (AR 387.)

Lack of compliance with treatment recommendations is relevant to an assessment of a

claimant's credibility.  *See Rye*, 2016 WL 632242, at *12; *see also* SSR 96-7p, 1996 WL

374186, at *7 (claimant's statements "may be less credible if the level or frequency of treatment

is inconsistent with the level of complaints, or if the medical reports or records show that the

individual is not following the treatment as prescribed and there are no good reasons for this

failure").  Here, Turner's rejection of treatments such as facet injections and occipital nerve

blocks supports the ALJ's credibility determination; Turner supplies no good reason for failure

to engage with those treatment options.  That determination is also supported by Dr.

Hogenkamp's observations that Turner is a "poor historian" and that he repeatedly cancelled or

failed to show up for appointments.  *See Cabrero-Gonzalez v. Colvin*, No. 13-CV-6184-FPG,

2014 WL 7359027, at *18 (W.D.N.Y. Dec. 23, 2014) (observation that claimant was a poor historian supported ALJ's credibility determination).[12]

Turner's failure to attend recommended physical therapy also constitutes at least some basis for discounting his credibility. It is true that, as SSR 96-7p recognizes, failure to engage with treatment might be explained in cases where the individual is unable to afford treatment and does not have access to free or low-cost services. SSR 96-7p, 1996 WL 374186, at *8. In this case, the ALJ noted that PA-C James Hollinshead remarked that physical therapy was not available to Turner "due to cost," so Hollinshead resorted to teaching Turner some basic range-of-motion exercises to do. (AR 326.) However, Hollinshead also suggested that Turner might be able to get "clearance" for physical therapy, (id.), so it appears that there was a possibility of obtaining free or low-cost services. Turner notes Hollinshead's April 2013 report that Turner did receive physical therapy after the October 25, 2012 accident, but that physical therapy did not improve his condition. (AR 507.) On the other hand, Dr. Greenleaf opined in October 2013 that she believed physical or occupational therapy was in Turner's "best interest of recovery." (AR 541.) There was thus substantial evidence that compliance with the physical therapy recommendations would have benefitted Turner.

### F.    Daily Activities

The ALJ found that, in contrast to Turner's allegations, the record showed that he was "able to engage in a wide range of daily activities." (AR 22.) The ALJ noted Turner's report of his ability to perform personal care activities and drive. (See AR 219 (function report indicating no problem with personal care); AR 370 ("Personal care is sufficient. He can drive.").) The ALJ

---

[12] Some examples of Turner's poor historical reporting are mentioned above: he has provided competing reports about the level of education he has obtained, and about his ability to drive a car.

also noted that Turner reported being able to dust and sweep the house, and leaving the house twice per day. (AR 220–21.) Turner also reported regularly going to the store to buy coffee and gas, and to visit family. (AR 222.) The ALJ stated that Turner "does not present with any muscle atrophy, which suggests that he does remain active to some degree." (AR 21.)

Turner points out that Dr. Greenleaf did find some muscle atrophy on November 15, 2013. (Doc. 14 at 25.) As discussed above, however, that single finding in late 2013 does not establish atrophy dating back to Turner's alleged disability onset date of August 13, 2010. Nor is it inconsistent with the ALJ's finding that Turner remained active "to some degree."

When viewed as a whole, the record does not show that Turner regularly engaged in particularly substantial daily activities. He reported being able to dress and bathe only "slowly." (AR 219.) The only household chores he listed as being able to do were dusting and sweeping, and only once a week. (AR 220.) He stated that he did not do other house or yard work "due to neck, back, & leg pain, headaches." (AR 221.) He stated that he only drove "when headaches & blurriness subside" and that he does not drive if he is in a lot of pain. (*Id.*) In short, the daily activities that Turner reported being able to perform are relatively limited. They are not necessarily inconsistent with a disability finding. *See Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) ("'[A] claimant need not be an invalid to be found disabled . . . .'" (quoting *Murdaugh v. Sec'y of Health & Human Servs.*, 837 F.2d 99, 102 (2d Cir. 1988))). Nor are they inconsistent with Turner's testimony that he spends the majority of each day sleeping. To the extent that the ALJ had the impression that Turner engaged in no daily activities other than sleep, the record is inconsistent with that impression, but otherwise supplies relatively little support for discounting Turner's credibility on this point.

### G.     Work History

Turner asserts that the ALJ improperly failed to consider his work history in the credibility determination. (Doc. 14 at 25.) The Commissioner does not dispute that the ALJ did not specifically mention Turner's consistent work history in his decision, but asserts that the ALJ was not required to do so, and that work history is just one of many factors. (Doc. 20 at 21–22.) As Turner correctly notes, "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983). The Commissioner does not dispute that Turner has a good work record; indeed, the record demonstrates a work history dating back to 1978. (AR 187.)

### H.     Conclusion Regarding ALJ's Credibility Determination

Some of the factors bearing on Turner's credibility—such as the issue of his sleep and his daily activities—only weakly support the ALJ's determination. Other factors—such as Turner's work history—actually bolster his credibility. However, on balance, the court cannot conclude that the ALJ's credibility findings are "patently unreasonable." Regarding objective medical evidence, the record supports the ALJ's conclusions that the deficits and abnormalities identified on examination were not commensurate with the degree of limited functioning that Turner described at the hearing. The ALJ also properly relied on the discontinuation of neuropsychological testing to support his credibility determination. And the ALJ properly relied on Turner's lack of compliance with repeated treatment recommendations and his repeated failures to show up for medical appointments.

## III.     Step-Five Findings Regarding Education and Literacy

In his analysis regarding Turner's impairments, the ALJ noted that Turner did not allege any mental health condition, but that he did allege that he could not read or write. (AR 16.) The

ALJ remarked that Turner "ran his own business rebuilding transmissions, and worked doing maintenance for ski resorts and hotels, with the ability to earn over the substantial gainful activity level [$28,478 in 2009]." (*Id.* (brackets in original).)[13]  The ALJ also noted that Turner reported a seventh grade education, but that there were "no records to substantiate his alleged inabilities." (AR 16.)  The ALJ concluded that Turner did not have any "medically determined mental health impairment." (*Id.*)

In his step-five analysis, the ALJ found that Turner is able to communicate in English, but that he has a "limited education." *See* 20 C.F.R. §§ 404.1564(b)(3); 416.964(b)(3) ("Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs.  We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.").  The ALJ did not find that Turner was illiterate[14] or that he had only a "marginal education."[15]  VE Parker testified that the price-marker, small-product-assembler, and gate-guard positions could be performed with a seventh grade education, but only "with the ability to read." (AR 57.)  Based on VE Parker's testimony, the ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (AR 25.)

---

[13] The record shows that Turner earned $28,478.12 in 2009.  (AR 187.)

[14] The Regulations define illiteracy as "the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. §§ 404.1564(b)(1); 416.964(b)(1).

[15] The Regulations define "marginal education" as "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  We generally consider that formal schooling at a 6th grade level or less is a marginal education." 20 C.F.R. §§ 404.1564(b)(2); 416.964(b)(2).

Turner contends that he is in fact illiterate, and that the ALJ's vocational findings and conclusions are contrary to the evidence because the ALJ failed to account for his illiteracy. (Doc. 14 at 25.)  The Commissioner maintains that Turner failed to rebut the presumption that he had a "limited education" other than through his own statements, and asserts that the ALJ properly considered that Turner had run his own business successfully, suggesting that his cognitive functioning was not as limited as Turner claimed.  (Doc. 20 at 23.)  In reply, Turner insists that the ALJ erred because the only direct evidence regarding literacy was his testimony he "[c]an't read or write, no math."  (AR 36.)[16]

The ALJ accepted Turner's testimony that he had a seventh grade education.  Under 20 C.F.R. § 404.1564(b)(3), that would generally put Turner in the "limited education" category.  However, that general rule does not preclude a finding that the abilities of a claimant with a seventh-grade education might be less than those described for individuals with a "limited education."  Here, there were sufficient indications in the record to suggest that might be the case for Turner.  Turner's work history does not necessarily prove ability to read at a seventh grade level.

*Colon v. Astrue*, No. 09-CV-6527, 2010 WL 2925969 (W.D.N.Y. July 23, 2010), is instructive.  In that case, the court remanded for further development of the record as to the claimant's alleged illiteracy.  The claimant had listed a learning disability as one of his disabling conditions.  The claimant had completed the ninth grade (attending special education classes).  He testified that his writing ability was limited to signing his name, and that he had only a very limited ability to read a newspaper.  His wife also testified that she often had to read his mail to

---

[16] Turner also indicated on his January 16, 2012 Adult Function Report that he "can not read."  (AR 223.)

him. The claimant's wife had filled out the Social Security forms to make his claim. *Id.* at *2. No formal testing had been performed to determine the claimant's literacy level. *Id.* at *3.

This case is unlike *Colon* in some ways: Turner did not allege any learning disability or other mental health condition, and there was no evidence that Turner attended special education classes. However, *Colon* is similar in other material respects. Turner had completed some secondary education. It appears that he can sign his name, but his testimony is that he cannot read or write. Turner's wife also filled out his claim forms. Importantly, despite Turner's claim of illiteracy and the Commissioner's burden at step five, no formal testing was performed to determine Turner's literacy level prior to the ALJ's decision.[17]

The court therefore concludes that the case must be remanded for the ALJ to further develop the record with respect to Turner's alleged illiteracy, and to consider what effect that condition may have on his capacity to perform work in the national economy. The court rejects Turner's request that the case be remanded solely for a calculation of benefits. (Doc. 14 at 1, 27; Doc. 23 at 9.) Here, there is a gap in the record regarding Turner's literacy, so remand for further development of the evidence is appropriate. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

---

[17] Turner has since undergone academic testing by psychologist Dr. Craig Knapp, who issued a 19-page report dated June 10, 2015, finding that Turner's academic skills in reading, spelling, and math are at or below the first percentile in comparison to other people his age, and that none of his skills exceed the third grade level. (Doc. 14-2 at 14.) Dr. Knapp diagnosed Turner with, among other things, "Specific Learning Disability with impairment in reading, severe." (*Id.* at 18.) The Commissioner asserts that Turner cannot show that Dr. Knapp's report meets the requirements for remand based on newly-submitted evidence. (Doc. 20 at 24.) The court merely notes Dr. Knapp's report here. The court reaches its conclusions based not on Dr. Knapp's report, but on the fact that there was a gap in the record at the time the ALJ issued his decision regarding Turner's level of literacy.

**IV.    Appeals Council's Decision Not to Consider Additional Evidence**

Although the court has concluded that remand is necessary, it nevertheless proceeds to

consider Turner's challenge to the Appeals Council's decision not to consider additional

evidence. As noted above, while Turner's appeal to the Appeals Council was pending, he filed a

request that the Appeals Council consider new evidence regarding his recent diagnosis of tongue

cancer and scheduled surgery for partial removal of his tongue. (AR 255–56.)  In a decision

dated March 10, 2015, the Appeals Council declined to consider that additional evidence,

reasoning that it did not meet the criteria for consideration under 20 C.F.R. § 405.401(c).

(AR 2.)

Turner claims that the Appeals Council's citation to § 405.401(c) was mere "boilerplate"

without analysis, and that if the Appeals Council had considered the supplemental medical

records, there is a reasonable probability that the outcome would have been different. (Doc. 14

at 28.)  The Commissioner maintains that the Appeals Council properly denied review because

the additional evidence did not relate to the period on or before the ALJ's decision. (Doc. 20

at 23.)[18]

The Appeals Council declined to consider Turner's additional evidence, relying on

20 C.F.R. § 405.401(c).  That section provides:

---

[18] The Commissioner cites 20 C.F.R. §§ 404.970(b) and 416.1470(b) for the proposition
that new evidence must relate to the period on or before the ALJ's decision. (Doc. 20 at 23.)
Those sections do indeed contain that requirement, but the court notes at least one case holding
that § 405.401 governs claims filed in states like Vermont. *See Orriols v. Colvin*, No. 3:14-cv-
863 (SRU), 2015 WL 5613153, at *3 (D. Conn. Sept. 24, 2015) ("[A]lthough sections 404 and
416 may *generally* govern procedures in the Boston region [Social Security Region 1 (which
includes Vermont)], section 405.401 is an exception to that rule, and should apply to
considerations of new evidence *instead* of any provision in 416."). The court need not resolve
that issue here, however, since all of the sections indicated contain the same requirement that
new evidence must relate to the period on or before the ALJ's decision.

> If you submit additional evidence, the Appeals Council will consider the additional evidence only where it relates to the period on or before the date of the hearing decision, and only if you show that there is a reasonable probability that the evidence, alone or when considered with the other evidence of record, would change the outcome of the decision, and
>
> (1) Our action misled you;
> (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from submitting the evidence earlier; or
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from submitting the evidence earlier.

Although the Appeals Council did not supply much analysis, the court's review of the supplemental administrative record (AR 560–627) reveals that the Appeals Council properly concluded that there was no reasonable probability that the additional evidence would change the outcome.[19]

The record before the ALJ did indicate that Turner did not eat much due to leukoplakia and a sore mouth. (AR 219.) Treatment notes indicated that leukoplakia was consistently observed. (AR 295, 298, 300, 302–03, 308, 310, 346.) The record before the ALJ also included a January 15, 2009 letter from Dr. David Charnock noting "severe hyperkeratosis, leukoplakia floor of mouth" which was "probably progressive," and recommending biopsies. (AR 458.) Dr. Charnock noted that Turner was "adamantly opposed to a surgery or biopsies." (*Id.*) Dr.

---

[19] Although sections 404, 405, and 416 of the Regulations all contain the same requirement that new evidence must relate to the period on or before the ALJ's decision, they have what might appear to be different requirements regarding how to evaluate the effect of new evidence. Section 405.401(c) uses the language of "reasonable probability." Sections 404.970(b) and 416.1470(b) refer to evidence that is "new and material." This court has previously applied the latter standard, *see Gerbasi v. Comm'r of Soc. Sec.*, No. 5:14-cv-246, 2015 WL 4470001, at *11 (D. Vt. July 21, 2015), but other courts have stated that the "reasonable probability" test applies in Social Security Region 1, *see Wilson v. Colvin*, No. 2:13-cv-197-JDL, 2014 WL 4715406, at *2 n.1 (D. Me. Sept. 22, 2014). To the extent there is any difference, the court concludes that it is immaterial to the outcome in this case. *Cf. Orriols v. Colvin*, No. 3:14-cv-863 (SRU), 2015 WL 5613153, at *3 (D. Conn. Sept. 24, 2015) (remarking that *Wilson* supplies no explanation for any meaningful distinction between the "reasonable probability" and "new and material" standards).

Charnock's letter also stated that he counseled Turner "on the risk of cancer within this dense leukoplakia." (*Id.*)

The court rejects the Commissioner's contention that the additional evidence does not "relate" to the period on or before the ALJ's decision. The additional evidence reveals that Turner noticed a tongue lesion around the time of his motorcycle accident, and that since that time the lesion had grown in size and had become more tender. (AR 586.) Turner was not formally diagnosed with cancer until after the ALJ's February 27, 2014 decision. However, that diagnosis is "related" to the period at issue because Turner had noticed a tongue lesion and because he had severe leukoplakia that he had been warned carried a risk of cancer. Turner's resistance to a biopsy prevented an earlier diagnosis, and suggests that he may have been suffering from undiagnosed cancer during the time period at issue.

The court concludes, however, that there was no reasonable probability that the additional evidence would change the outcome. Turner describes the effects of the course of treatment he underwent after the cancer diagnosis, including major surgery with extraction of teeth and excision of portions of his tongue and the floor of his mouth, as well as post-operative complications. (*See* Doc. 14 at 29–30.) None of those effects, however, occurred prior to the date of the ALJ's decision.

## Conclusion

For the above reasons, Turner's motion (Doc. 14) is GRANTED IN PART, and the

Commissioner's motion (Doc. 20) is DENIED.  The case is remanded for further proceedings

and development of the record in accordance with this decision.

Dated at Rutland, in the District of Vermont, this 27 day of June, 2016.

Geoffrey W. Crawford, Judge
United States District Court